**Sonia COLON, Plaintiff,**

v.

**Officer William LUDEMANN and Officer John Doe of the Town of Enfield Police Department in their individual capacities, Defendants.**

**No. CIV.A.3:01–CV–2052 (JCH).**

United States District Court,
D. Connecticut.

Sept. 23, 2003.

---

Kevin A. Randolph, Law Offices of Kevin A. Randolph, Hartford, CT, for plaintiff.

James Newhall Tallberg, Todd E. Cusano, Updike, Kelly & Spellacy, P.C., Hartford, CT, Maria Nora Stavropoulos, Enfield, CT, for defendants.

### RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 14]

HALL, District Judge.

Plaintiff Sonia Colon filed this civil rights action pursuant to 42 U.S.C. § 1983 against two officers of the Enfield Police Department in Connecticut in their individual capacities, alleging false arrest under the Fourth Amendment and intentional infliction of emotional distress under

Connecticut state law. The plaintiff claims that defendants William Ludemann and John Doe, an unnamed officer, maliciously and/or recklessly made false statements when applying for the warrant ultimately used to arrest her, and that this conduct caused her to suffer emotional distress. The defendants have moved for summary judgment with respect to both the federal and state claims. *See* Defendants' Motion for Summary Judgment [Dkt. No. 14].

The court grants summary judgment in favor of both defendants with respect to the plaintiff's false arrest claim. Having disposed of the plaintiff's sole federal cause of action, the court dismisses the plaintiff's pendant state law claim for intentional infliction of emotional distress for lack of federal jurisdiction.

## I. FACTS [1]

On or about February 12, 2000, four guest rooms at the Radisson Hotel in Enfield, Connecticut were burglarized while their occupants were away; there were no signs of forced entry. The plaintiff, one of the Radisson's housekeeping staff, worked at the hotel from approximately 2 pm until 1 am on the day of the burglaries. During portions of her shift, the plaintiff worked with another member of the housekeeping staff, Lilia, and, at times, a third housekeeper, Priscilla, was present.

On February 13, 2000, four separate Enfield police officers began investigating the hotel burglaries. In the course of their investigation, the officers obtained a list of employees, *see* Defs.' Ex. 6 [Dkt. No. 16], who had been at work when the burglaries

occurred.[2] The two members of the housekeeping staff who are listed as such are Lilia and "Sonea." The investigating officers learned that an electronic masterkey, assigned to maintenance worker Robert Milesi and missing for about three weeks, had been used to enter the burglarized rooms. Over the plaintiff's denials, the defendants claim that the lock memory for the rooms that had been burglarized showed that the keycard issued to the plaintiff has been used immediately before the missing keycard. The case was thereafter transferred to the detective bureau of the Enfield Police Department.

The investigating officers also learned from Remo Pizzichemi ("Remo"), the assistant general manager of the hotel, that he had seen the plaintiff on the back steps of the hotel near the parking lot on February 12, 2000. On March 6, 2000, Officer Ludemann and Detective Cooper took over the investigation and arranged with the plaintiff to interview her that night. Later on the same day, the plaintiff cancelled the appointment and retained an attorney, who directed the officers not to contact the plaintiff further.

In response to their request regarding a credit card that had been stolen from one of the burglarized hotel rooms, Enfield police received a facsimile from First USA Master Card indicating that the stolen credit card had been used on February 13, 2000 at a Waldbaums Super Foodmart in Springfield, Massachusetts located approximately 1.5 miles from the plaintiff's home.[3] On June 5, 2000, Officer Lude-

1. The following recitation presents the facts in the light most favorable to the plaintiff but explicitly notes any factual disputes among the parties.

2. The circumstances surrounding the production of this list remain unclear based on the record. *See* discussion, *infra.*

3. Although the plaintiff does not deny this allegation, *see* Pl's "Local Rule 9(c)2 Statement" ¶ 29 [Dkt. No. 19], the court notes that the defendants' own evidence on this issue, which consists of a printout from a search on MapQuest, *see* Def's Ex. O [Dkt. No. 16], calculates the distance as 2.49 miles. The court further notes that one can obtain yet

mann met with a Waldbaums' loss prevention representative at the store in question, who played for him the surveillance videotape of the transaction involving the stolen credit card.

The parties dispute how much can be discerned from the video, but they seem to agree that the video depicts two people at the register: one is short and is wearing a black, down jacket; the other, who is heavyset, is wearing a gray winter jacket and a winter ski hat. *See* Pl's "Local Rule 9(c)2 Statement" at ¶ 32–33 [Dkt. No. 19]. However, over the plaintiff's denials, the defendants claim that the video shows two Hispanic-looking females at the register purchasing several items with the stolen credit card, and further assert that two hotel employees later confirmed that the plaintiff was known to wear a black, down jacket. *Id.* at 31–34. In contrast, the plaintiff asserts that the videotape was of such poor quality that the genders of those viewed could not have been discerned, let alone the plaintiff identified as one of the people imaged. However, she admits to owning, or having owned in the past two years, "a black down winter jacket or jacket of similar appearance." Defs.' Ex. B: Pl's Response to Defs.' Interrogatory # 12 [Dkt. No. 16].

On June 8, 2000, Officer Ludemann completed an arrest warrant application, *see* Pl's Ex. 2 [Dkt. No. 19]; Defs.' Ex. N [Dkt. No. 16], which sought charges for second-degree burglary and sixth-degree larceny. The plaintiff claims the warrant affidavit contained two inaccuracies. First, it alleged that "[t]he accused was the only member of the housekeeping staff working at the time that the burglaries occurred." Defs.' Ex. N ¶ 5. Second, it stated in unequivocal terms that "[t]he suspect in the video was the accused." *Id.*

¶ 11. Ludemann also stated in his affidavit in support of the warrant application: "The lock memory [for the rooms which were burglarized] showed that the missing keycard was used immediately after the keycard issued to the accused was used. This indicates that the accused inadvertently used her own card in error." *Id.* ¶ 5. On June 23, 2000, a judge signed the arrest warrant, which made a specific finding of probable cause. On June 30, 2000, Officer Ludemann and another female officer arrested the plaintiff.

On April 24, 2001, a *nolle prosequi* was entered in the criminal case against the plaintiff. Referring to the decision not to prosecute the case, Assistant State's Attorney Christopher Parakilas explained to the state judge:

> Mr. Russotto from our office and I have reviewed the Walbaum's security, the videotape in question, and quite frankly—the investigator and I, had a difficult time identifying whether the perpetrator, or person in the video, is male or female, never mind Ms. Colon.
>
> There are some other misstatements of fact, as I would call them, in the affidavit which leads me to believe that the whole investigation's credibility is somewhat in check.

Pl's Ex. 8: *State v. Colon* Tr. at 1 [Dkt. No. 19]. In stark contrast with the sworn statement made by her former attorney, the plaintiff claims that her lawyer did not explain the full implications and consequences of the entry of the *nolle* and did not ascertain whether she wanted to proceed to a full trial on the merits. *Compare* Pl's "Local Rule 9(c)2 Statement" ¶¶ 43–45 *with* Defs.' Ex. R: Affidavit of J. Timothy Mannion [Dkt. No. 16].

another estimate from MapQuest, of 2.02 miles, simply by reversing the order of the

addresses entered into the "to" and "from" boxes.

The plaintiff then brought this suit in federal court pursuant to 42 U.S.C. § 1983. The defendants have moved for summary judgment with respect to both causes of action. The court grants the motion for summary judgment with respect to the false arrest claims against both defendants and therefore also dismisses the plaintiff's remaining pendant state claim for lack of federal jurisdiction.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 107 (2d Cir.2000). The moving party bears the burden of showing that no genuine factual dispute exists. *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 133 (2d Cir.2000) (citing *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1994)). In assessing the record to determine if such issues exist, all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 721 (2d Cir.1994). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. When reasonable persons applying the proper legal standards could differ in their responses to the questions raised on the basis of the evidence presented, the question is best left to the jury.

*Sologub v. City of New York*, 202 F.3d 175, 178 (2d Cir.2000).

Once the moving party has met its burden, in order to defeat the motion the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505, and present such evidence as would allow a jury to find in his favor, *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir.2000). A party may not rely "on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Lipton v. The Nature Company*, 71 F.3d 464, 469 (2d Cir.1995) (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986)). Additionally, a party may not rest on the "mere allegations or denials" contained in his pleadings. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.1995). *See also Ying Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir.1993) (holding that party may not rely on conclusory statements or an argument that the affidavits in support of the motion for summary judgment are not credible).

## III. DISCUSSION

The court grants the motion for summary judgment with respect to the false arrest claims against both defendants and therefore also dismisses the plaintiff's remaining pendant state claim for lack of federal jurisdiction.

### A. *SECTION 1983 CLAIM FOR FALSE ARREST* (Counts One & Two) [4]

The plaintiff alleges that she was falsely arrested as a result of two false statements

---

**4.** The complaint contains three counts, although it seeks to allege only two causes of action. Count One very generally invokes 42 U.S.C. § 1983 by alleging that Ludemann violated the plaintiff's constitutional rights under color of law. Count Two, entitled "FALSE ARREST AGAINST INDIVIDUAL DEFENDANT," states that the police officers "false

made by Officer Ludemann in his warrant application that were material to the finding of probable cause. The defendants respond that, even without these allegedly false statements, the affidavit was supported by probable cause, which offers a complete defense to a claim for false arrest. The defendants also argue that the plaintiff cannot prevail on her false arrest claim because she did not obtain a favorable disposition of the criminal charges against her. In the alternative, the defendants urge the court to dismiss the false arrest claim against Ludemann on qualified immunity grounds. Finally, the defendants contend that summary judgment should be granted on the plaintiff's false arrest claim against Officer John Doe because of the plaintiff's failure to plead facts specific enough to permit the party to be identified through reasonable discovery. The court finds this final argument specific to the unnamed defendant to be persuasive and thus grants summary judgment in favor of John Doe on the false arrest claim. The court also grants summary judgment in favor of Ludemann based on qualified immunity. Thus, the defendants' motion for summary judgment on the false arrest claims is granted.

### 1. Significance of Entry of Nolle Prosequi in the Underlying Criminal Case

The defendants urge the court to grant summary judgment on the plaintiff's false arrest claim, suggesting that a *nolle prosequi* ("nolle") does not qualify as a "favorable termination" of the criminal charges

necessary to bring such a claim. Defs.' Mem Sup. Mot. Sum. Jud., at 13–14 [Dkt. No. 16]. In support of this legal proposition, they rely almost solely on the Second Circuit's decision in *Roesch v. Otarola*, 980 F.2d 850 (2d Cir.1992). The plaintiff attempts to distinguish the facts of *Roesch* but offers no case law to support her argument. The court declines to grant summary judgment on the false arrest claim on this basis.

"A nolle is, except when limited by statute or rule of practice[,] *see, e.g.,* [Connecticut] General Statutes § 54–56b and [Connecticut] Practice Book § 726[,] a unilateral act by a prosecutor, which ends the 'pending proceedings without an acquittal and without placing the defendant in jeopardy.'" *Haynes v. City of New London,* 99:CV2551 (CFD), 2002 WL 1204956, *2, 2002 U.S. Dist. LEXIS 10366, *4–6 (D.Conn. May 17, 2002) (quoting *Cislo v. City of Shelton,* 240 Conn. 590, 599 n. 9, 692 A.2d 1255 (Conn.1997)). Connecticut General Statutes section § 54–56b, which is entitled "Right to dismissal or trial on nolle," provides:

A nolle prosequi may not be entered as to any count in a complaint or information if the accused objects to the nolle prosequi and demands either a trial or dismissal, except with respect to prosecutions in which a nolle prosequi is entered upon a representation to the court by the prosecuting official that a material witness has died, disappeared or become disabled or that material evidence has disappeared or has been destroyed

arrested and illegally imprisoned" the plaintiff and harmed her in doing so, ostensibly in violation of Section 1983. Count Three alleges a claim for intentional infliction of emotional distress. In light of earlier references to the Fourth Amendment in the complaint, and the complete absence of any mention of state law with respect to this claim, this court

reads Counts One and Two together to interpret the complaint as alleging a false arrest claim under the Fourth Amendment, rather than state law. The court notes that this is the only interpretation that would support the plaintiff's claim of federal jurisdiction under 42 U.S.C. § 1331.

and that a further investigation is therefore necessary.

*Id.* Thus, although not always the case, a nolle may be entered without the consent of the accused. Based on the evidence presented to the court, it is unclear whether the plaintiff consented to the entry of the nolle.[5]

As the Second Circuit has suggested in subsequent cases, the facts involved in *Roesch* were fairly unique. *Roesch* involved a false arrest suit by a defendant who had taken advantage of Connecticut's trial rehabilitation program provided for in Connecticut General Statutes section 54–142a. The panel's opinion in *Roesch* described the Connecticut program in detail: according to the panel, the program is used "for those defendants without a previous record who the court does not believe will commit a crime in the future. If the accused meets the conditions set by the court, the charges are dismissed, and all records of the charges are erased pursuant to Conn. Gen.Stat. Ann. § 54–142a." *Id.* at 852–53. Either party-but not the court-can make a motion to have the charges dismissed under this program, and the consent of both sides is not necessary. *Id.* at 853. "The court can set a probationary period of up to two years, and the case is dismissed upon an application by the defendant or the probation office." *Id.* The *Roesch* court characterized the program as "intended to give first-time offenders a second chance." *Id.*

The Second Circuit panel in *Roesch* seemed to characterize its holding fairly narrowly: "Thus, we hold that a dismissal pursuant to the Connecticut accelerated pretrial rehabilitation program is not a

termination in favor of the accused for purposes of a civil rights suit." *Id.* However, the court also stated more broadly that "[a] person who thinks there is not even probable cause to believe that he committed the crime with which he is charged must pursue the case to an unqualified acquittal or unqualified dismissal." *Id.*

Since its decision in *Roesch*, the Second Circuit has twice revisited questions concerning what constitutes a favorable termination and whether a favorable termination is necessary to state a claim for false arrest. The first opportunity came in *Johnson v. Bax*, 63 F.3d 154 (2d Cir.1995), where the court analogized New York's "adjournment in contemplation of dismissal" ("ACD") under N.Y. Crim Proc. Law section 170.55 (McKinney 1993) to the Connecticut trial rehabilitation procedure at issue in *Roesch*, holding that the defendant's acceptance of an ACD, which the court characterized as an unfavorable termination, barred his false arrest claim. *See Johnson*, 63 F.3d at 157, 159.

However, in its most recent pronouncement on the issue, *Weyant v. Okst*, 101 F.3d 845 (2d Cir.1996), the Second Circuit Court of Appeals announced that it "ha[d] several difficulties with [the *Roesch*] ruling." Although the section 1983 false arrest claim before the court in *Weyant* involved events occurring in New York and therefore implicated New York state law, *id.* at 853 (quoting *Singer v. Fulton County Sheriff*, 63 F.3d 110, 118 (2d Cir.1995)) ("The elements of a claim of false arrest under § 1983 are substantially the same as the elements of a false arrest claim under

---

**5.** Although not relevant to the discussion that follows, the court notes that, contrary to the allegations made by her former attorney, the plaintiff claims that she was not fully informed of the consequences resulting from

the entry of a nolle. *Compare* Pl's "Local Rule 9(c)2 Statement" ¶¶ 43–45 *with* Defs.' Ex. R: Affidavit of J. Timothy Mannion [Dkt. No. 16].

New York law."),[6] the court criticized the *Roesch* decision. The *Weyant* court characterized *Roesch* as a case in which the panel "impose[d] a favorable-termination-of-prosecution requirement in connection with a disposition similar to a settlement of the litigation." *Id.* at 853. The court also noted that, despite *Roesch's* suggestion to the contrary, Connecticut state law is not clearly settled on the question of whether favorable termination is an element of a claim for false arrest. *Id.* at 853 ("[W]e are not aware of any opinion by Connecticut's highest court addressing the issue of favorable termination in the context of a claim for false arrest where there has been no determination as to guilt."). The court then went on to distinguish the facts of *Roesch* but also to state its holding quite broadly: "In sum, the ruling in *Roesch* is no impediment to our conclusion here that a person who asserts that he has been arrested without a warrant and without probable cause-a claim that does not seek to cast doubt upon judicial proceedings and is ripe upon arrest-need not insist that a prosecution be brought against him in order that he be allowed to pursue a claim for false arrest." *Id.* at 854.

■ With one notable exception, the district courts in the District of Connecticut which have grappled with these thorny questions of law have concluded that a nolle does not defeat a false arrest claim.[7] This court agrees with the careful reasoning articulated in *Haynes*, 2002 WL 1204956, *2, 2002 U.S. Dist. LEXIS 10366, *4–6, and *Sabir v. Jowett*, 214 F.Supp.2d 226 (D.Conn.2002), on this question and therefore adopts their reasoning in full.[8]

---

**6.** *See also Posr v. Doherty*, 944 F.2d 91, 96 (2d Cir.1991), where the Second Circuit held that the elements of a false arrest claim under section 1983 are substantially the same as those under state law.

**7.** *See Haynes*, 2002 WL 1204956, *2, 2002 U.S. Dist. LEXIS 10366, *4–6 (denying summary judgment motion to dismiss false arrest claim despite entry of nolle because "[i]t is not necessary that the accused should have been acquitted" but it is sufficient that he "was discharged without a trial under circumstances amounting to an abandonment of the prosecution without the request or arrangement with him.") (quoting *See v. Gosselin*, 133 Conn. 158, 160, 48 A.2d 560 (1946)); *Sabir v. Jowett*, 214 F.Supp.2d 226, 241 (D.Conn.2002) (CFD) ("However, there is some authority that a nolle can be a sufficient basis on which probable cause may be challenged."); *cf. Horton v. Town of Brookfield*, 98CV01834(JCH), 2001 WL 263299, *3, 2001 U.S. Dist. LEXIS 3378, *9–10 (D.Conn. March 15, 2001) (stating that "if a valid judgment of conviction exists, .... the municipal defendants [would be] entitled to summary judgment on the ... false arrest claim[]" but refusing to do so because "genuine issues of material fact exist as to whether the prosecution was terminated in [defendant's] favor or whether it was conditionally dismissed" with the understanding that she perform ten hours of community service and pay $40.00); *White v. Wortz*, 66 F.Supp.2d 331, 334 (D.Conn. 1999) (WWE) (finding that the prosecution did not terminate in the defendant's favor despite the entry of a nolle because the dismissal of the two counts was part of a knowing plea agreement); *but see Birdsall v. City of Hartford*, 249 F.Supp.2d 163, 171 (D.Conn. 2003) (SRU) (relying only on *Roesch* and *Singleton v. City of New York*, 632 F.2d 185 (2d Cir.1980), to conclude that "a nolle, like an adjournment in contemplation of dismissal, ... involves the consent of both the prosecution and the accused and leaves open the question of the accused's guilt") (internal citation and quotation marks omitted).

**8.** The case law from the Southern, Eastern, and Northern Districts of New York are also instructive on this question. For example, the District Court for the Southern District of New York in *Wedderburn v. City of New York*, 00 Civ. 4027, 2000 WL 1877100, *1, 2000 U.S. Dist. LEXIS 18514, *3–4 (S.D.N.Y. December 27, 2000), stated:

> Turning to plaintiff's § 1983 claim, while there is authority for the proposition that the absence of a favorable termination prohibits a suit for false arrest as well as for malicious prosecution, *see, e.g., Johnson v.*

Thus, viewing the facts in the light most favorable to the plaintiff, the entry of a nolle in the underlying criminal case against the plaintiff does not preclude her claim for false arrest.

### 2. *Probable Cause as a Complete Defense*

█ It is well established that "[a] § 1983 claim of false arrest based on the Fourth Amendment right to be free from unreasonable seizures may not be maintained if there was probable cause for the arrest." *Kent v. Katz,* 312 F.3d 568, 573 (2d Cir.2002); *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996); *Singer v. Fulton County Sheriff,* 63 F.3d 110, 118 (2d Cir. 1995) ("There can be no federal civil rights claim for false arrest where the arresting officer had probable cause."). Thus, a finding of probable cause is a complete defense to an action for false arrest. *See, e.g., Bernard v. United States,* 25 F.3d 98, 102 (2d Cir.1994).

█ In determining whether police officers had probable cause to make an arrest, courts examine the "totality of the circumstances." *Bernard,* 25 F.3d at 102 (quoting *Illinois v. Gates,* 462 U.S. 213, 230, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). "Probable cause is established when the arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Singer,* 63

F.3d at 119 (internal quotation marks omitted). If there are no material facts in dispute "as to the pertinent events and the knowledge of the officers," the question of probable cause may be determined as a matter of law. *Weyant,* 101 F.3d at 852; *see also Singer,* 63 F.3d at 118–19.

With respect to the plaintiff's claim for false arrest, there are genuine issues of material fact as to whether some of the allegations Ludemann made in his warrant application were true, and, if they were not true, whether Ludemann made them knowingly and intentionally, or with reckless disregard for the truth. Because this allegedly false information was necessary to the finding of probable cause, the court concludes that Ludemann lacked probable cause to arrest the plaintiff and that summary judgment in favor of the defendants cannot be granted on this basis.

With respect to the contentious videotape evidence, the plaintiff asserts that Ludemann's allegation, made without qualification, that the plaintiff was the person in the Waldbaums videotape was patently false. The court notes that, if Ludemann's allegation were true, this evidence alone would have supplied probable cause to arrest the plaintiff, thus defeating her false arrest claim. However, the court finds that there exists a genuine issue of material fact as to whether the plaintiff could have been identified merely by viewing the videotape.

*Bax,* 63 F.3d 154 (2d Cir.1995); *Roesch v. Otarola,* 980 F.2d 850 (2d Cir.1992), more recent authority concludes that a favorable termination is not a required element of a false arrest claim. *Weyant,* 101 F.3d at 853–54; *Coakley v. Jaffe,* 49 F.Supp.2d 615, 623 (S.D.N.Y.1999); *Hazan v. City of New York,* 1999 WL 493352, *4, 1999 U.S. Dist. LEXIS 10499 (S.D.N.Y.1999); *Sorensen v. City of New York,* 1999 WL 511923, at *2, 1999 U.S. Dist. LEXIS 10927 (S.D.N.Y.

1999). *Cf. Breen v. Garrison,* 169 F.3d 152, 152–54 (2d Cir.1999) (dismissal for facial insufficiency pursuant to New York C.P.L. § 170.30 prohibits claim of malicious prosecution but not false arrest). *But see Bowles v. New York,* 37 F.Supp.2d 608, 611–12 (S.D.N.Y.1999). Thus, we conclude that plaintiff's acceptance of an ACD does not bar his claim for false arrest under § 1983. *Id.*

In support of her position, the plaintiff offers the state prosecutor's comments about the poor quality of the videotape and his suggestion that the warrant affidavit misstated the facts with respect to the clarity of the videotape.[9] Faced with this evidence, the defendants initially seemed disinclined to adopt the contrary position that the plaintiff could be readily identifiable in the videotape. For instance, neither Ludemann's affidavit, nor the defendants' Local Rule 9(c)(1) Statement [Dkt. No. 16], alleges that the plaintiff could have been identified merely by viewing the tape.

Nonetheless, in their Reply Brief [Dkt. No. 22], the defendants appear to be arguing that the tape alone could have supplied probable cause: they suggest for the first time in this brief that the state prosecutor's failure to use a special piece of equipment called a multiplexor could have negatively affected the quality of the tape. *Id.* at 6. The defendants attach to their reply brief the affidavit of Fran Rioux, a loss prevention manager at the Waldbaums store, in which she states that, although she has been unable to locate the videotape in question,[10] "[s]urveillance videotapes viewed without a multiplexor *may* blend multiple images, thereby making the videotape of little or no value in identifying specific persons, including a person's gender." Ex. V. at ¶ 10 (emphasis added) [Dkt. No. 16]. The court notes that one of Ludemann's police reports does indeed suggest that he viewed the tape using a multiplexor. Defs.' Ex. M at 2 [Dkt. No. 16].

In ruling on the motion for summary judgment, however, the court cannot assume that the state prosecutor failed to use a multiplexor when viewing the videotape or that, if he had, the clarity of the videotape would have improved sufficiently to provide a positive identification of the plaintiff, if it improved at all. Thus, because the plaintiff has created a genuine issue of material fact as to whether Ludemann's videotape allegation was true, the court cannot consider this allegation in determining whether the defendants had probable cause to arrest the plaintiff for purposes of deciding the summary judgment motion.

In the alternative, the defendants argue that Ludemann had probable cause to arrest the plaintiff even without the disputed positive identification provided by the videotape, and that the existence of probable cause defeats a claim for false arrest. In their reply brief, the defendants summarize the remaining evidence, which they argue together would have supported a finding of probable cause, even without the disputed videotape allegation. They note the fact that the plaintiff was working during the hours when the rooms were burglarized and the fact that a stolen credit card was used at a Waldbaums located approximately 1.5 to 2.5 miles from the plaintiff's home on the day after the robberies and on a day when the plaintiff was not at work. Defs.' Reply Brief at 5. The

**9.** The plaintiff also offers the affidavit of J. Timothy Mannion, the attorney who represented her in the underlying criminal case, in which he opines that "the video [ ]tape has no evidentiary value" and that it "was of poor quality and difficult to determine even the sex of the persons highlight by this video." He concludes by stating: "Ms. Colon was not seen in this video." Pl's Ex. 7 ¶¶ 5–7 [Dkt. No. 19].

**10.** The court has been presented with no information as to the whereabouts of the tape or even whether it has been lost or destroyed. If the defendants have the tape in their possession, it would seem a critical, if not dispositive, piece of evidence to have produced to support their argument that probable cause existed.

court adds to this evidence the fact the plaintiff owns or owned a black jacket and that the suspect in the video was wearing a black jacket, both of which are facts the plaintiff does not deny.

Although it is a close question, the court concludes that these facts together do not support a finding of probable cause. The evidence shows that the plaintiff was not the only employee, and perhaps not even the only member of the housekeeping staff, working at the time the burglaries occurred. In fact, one of the initial police reports refers to the existence of the employees list and soon thereafter recommends that the case be transferred to the detective bureau "due to the large number of employees that could be possible suspects." Defs.' Ex. E at 3 [Dkt. No. 16]. Even assuming that the burglaries were committed by an employee who had been working that day, rather than an employee who had not been at work, the employees list suggests that this description fit at least twenty-three employees. The court can only speculate as to how many Radisson employees work in the town of Enfield[11] but drive to their homes in Springfield, the nearest city, which is located approximately eight miles away, and also shop at the grocery store in question. How many of this subset of employees, however large or small, were also working on the day of the robberies but not the following day is anyone's guess. Likewise, the court notes that, without more, the evidence that the plaintiff was not at work on the day after the robberies occurred is not particularly probative: contrary to the defendants' suggestion, it is entirely possible that culprit worked on the day following the robberies, or for part of the day, but nonetheless managed to find time to do some grocery shopping. Without more relevant information from the defendants that would enable the court to assess these facts and the probabilities they suggest, the court cannot conclude that these facts provided probable cause to arrest the plaintiff.

Notably, the defendants' recitation of all the uncontested facts that support a finding of probable cause fails to mention a key allegation which, if true, would have undoubtedly have supported a finding of probable cause if taken together with the other uncontested evidence and may even have been sufficient on its own to provide probable cause. Ludemann alleges in the arrest warrant application that the lock memory showed that the keycard issued to the plaintiff was used immediately before the master keycard thought to have been used by the burglar (hereinafter, "lock memory allegation" or "lock memory evidence"). Although the reply brief makes no mention of this allegation, the defendants rely on this lock memory evidence in ¶ 17 of their Local Rule 9(c)(1) Statement and in their memorandum, see Memorandum In Support of the Defendants' Motion for Summary Judgment at 4 [Dkt. No. 15].

Due to the plaintiff's denials and the lack of corroborating evidence concerning the lock memory allegation, the court cannot consider this allegation as a basis to bolster the probable cause determination. The evidence substantiating this allegation is shaky at best and, at worst, inadmissible as hearsay. Based on the evidence before the court, the first reference to this critical lock memory evidence is a handwritten notation on a list of employees submitted by both parties as evidence. Although the plaintiff submits the list as an exhibit on its own, see Pl's Ex. 6 [Dkt. No. 16], the

11. The figures from the 2000 Census show that Enfield's population was approximately 45,212 people.

defendants include the list as a document attached to what they call "Christensen Case Report # C00–5902," *see* Defs.' Ex. E [Dkt. No. 19]. The plaintiff does not deny that the officers obtained a list of employees who had been at work when the burglaries occurred,[12] but the circumstances surrounding the production of this list remain unclear based on the evidence presently before the court. Remo, who provided the list to the officers, testified that he could not remember which employee he had asked to compile it. Def's Ex. D, at 23.

More importantly for these purposes, there are some critical but unidentified notations off to the side of the employees list which are ostensibly written in a different hand from the list of names. The first set of notations, written next to the plaintiff's name,[13] include an asterisk, check, and the following comment: "—her key was used and A key was used right after." Underneath this first set of notations is a second, which essentially reads: "*A key*— missing [electronic] masterkey / for 3 weeks / was used last nite in all 4 rooms." The defendants failed to offer any evidence or explanation concerning when the notations were written or by whom or indicating upon what source of knowledge they were based. No testimony or affidavit

from Officer Christensen, the officer who filed the report, was presented to the court.

Oddly enough, the fairly momentous information contained in the first notation is not even mentioned in the police report to which it was attached. This omission appears even more anomalous in light of the various facts that the report does mention. For example, the report gives a fair amount of detail concerning Christiansen's attempts to obtain fingerprints from the "door handles that this missing 'A key' [i.e. master key] accessed thru the night." *Id.* at 2. In this report, Christiansen mentions only the following related facts: that Remo had said that "many of the [burglarized] rooms were entered by a missing key (A-key) during the course of the night" and "that this missing masterkey has been missing for three weeks" and that Remo "provided [the officer with] a list of employees that worked on February 12, 2000." *Id.* Perhaps most odd is the fact that, in the report, Christiansen "request[s] [that] the case be forwarded to the [detective bureau] for follow-up" "due to the large number of employees that could be possible suspects." *Id.* at 3. If such lock memory evidence had been known to Christensen at the time he filed the report, why did he fail to mention it?

---

12. According to the defendants' Local Rule 9(c)(1) Statement [Dkt. No. 16], in the course of their investigation, the hotel's assistant general manager, "[Remo] Pizzichemi also provided the officers with a list of employees that worked during the hours of the burglaries." *Id.* ¶ 16. In response to this allegation, the plaintiff states in her "Local Rule 9(c)2 Statement" [Dkt. No. 19] only: "Admitted as to providing a list. Denied as to remaining facts."

Unfortunately, although the plaintiff admits only that the officers were given a list, apart from this partial denial, the plaintiff does not specify with which facts she takes issue and offers no specific evidence to support her

denial. For example, she offers no evidence to suggest that the list is not what its heading says it is: i.e., "Last Night employees 2/12/00." Whatever the plaintiff's objections to the list itself, the court notes that this list, because it includes the name of one member of the housekeeping staff other than the plaintiff, may actually lend some support to the plaintiff's allegation that Ludemann knowingly or recklessly stated falsely that she was the only member of the housekeeping staff working at the time of the burglaries.

13. The list includes a "Sonea" from "[h]ousekeeping." Neither party questions that this is a reference to the plaintiff. See, e.g., Def's Ex. D: Remo Dep., at 26.

Even more unsatisfying is Remo's testimony concerning this evidence. If anything, Remo's testimony on this issue only raised more questions about who saw the lock memory evidence, what exactly this evidence showed, and whether it still exists.[14]

Interestingly, Ludemann's allegations in the arrest warrant concerning this lock memory evidence are the most specific of any references found in the record, but there is nothing in the record that reveals the bases for these allegations. For example, in his affidavit, Ludemann states:

> 4. That the locks memory showed that Zdunek's room [i.e. the room from which the credit card was stolen] as well as rooms 122, 529, 533, and 234, the sites of related burglaries, had been entered utilizing the same missing master keycard between 20:12 hrs and 20:47 hrs of that day. The computer record shows that twenty-six rooms were entered in thirty-five minutes, and all of these rooms were entered by use of the missing card key. Five of the rooms were where burglaries took place.

Defs.' Ex N [Dkt. No. 16]. The affidavit then goes on to describe the lock memory evidence concerning the plaintiff's keycard. This detailed reference to the lock memory evidence-again, the most specific of all the references to this evidence-suggests that Ludemann himself may have searched the lock memory, or at least viewed a printout or received specific information from someone about the lock memory evidence. However, no such claim is made. An additional reference to this evidence can be found in a police report, *see* Defs.' Ex. J [Dkt. No. 16], filed after the officers allegedly obtained the employees list but before the warrant application was submitted. The report refers parenthetically to the plaintiff as having been "mentioned in two of the reports to have used her key and different key was used right after on a room that was burglarized." *Id.* Unfortunately, the defendants have failed to produce these reports. Thus, because the defendants produce no evidence concerning the source of this detailed information about the lock memory alleged in Ludemann's affidavit, there remains a genuine issue of material fact as to whether there was probable cause.[15]

---

**14.** This may merely have been the case because he was not asked outright these questions about the lock memory readout.

> Q: Now, on the same sheet next to Sonia in housekeeping there's a notation that says that her key was used and a key was used right after?
> A: Okay.
> Q: Do you remember seeing that writing at any time or having a conversation about what that notation meant?
> A: Yeah. It was the electronic readout of the locks showed that her key had been used and then immediately thereafter another key was used. That's what that's saying.
> Q: Okay. This was in one particular room?
> A: No, no. It had to do with all the rooms. And I can't be absolutely certain of that exact pattern, but—I can't be exact certain of that pattern, a double key hit, but I do know that through the entire property within—as I said, within seconds of one another, each door had

been entered, had been hit or, you know, opened.
> Q: Now, when you say opened, opened using two keys or one key?
> A: I can't answer that.
> Q: Okay.
> A: That I can't tell without looking at the readout.

Remo then went on to state that the lock memory may have been purged by the hotel as a matter of business practice but that he wasn't sure. Although he said he doubted the hotel had the readout, Remo suggested that the insurance company or the police department might have a copy.

**15.** The only other references to evidence from the lock memory is a police report filed on February 14, 2000 [Defs.' Ex. I], which states: "[Remo] stated that Sonia was the only employee at that time that had a master electronic key. [Remo] was going to check the integrity memory of the locks in all rooms to see if

Faced with these unexplained anomalies in the evidence, the court concludes that the plaintiff has raised a genuine issue with respect to this lock memory evidence. Because this lock memory evidence and/or the videotape allegation was necessary to a finding of probable cause, the court concludes that there remains a genuine issue of material fact as to whether the defendants had probable cause to arrest the plaintiff.

To conclude, probable cause is a complete defense to a false arrest claim, and the question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers. *See, e.g., Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996). The evidence presented so far in this case, when viewed in the light most favorable to the plaintiff, indicates that there are genuine issues of material fact as to whether the plaintiff's arrest was supported by probable cause. Thus, the court cannot grant the defendants' motion for summary judgment with respect to the false arrest claim on this ground.

### 3. *Defense of Qualified Immunity*

In the alternative, the defendants argue that even if the arrest was unsupported by probable cause, the court should find that qualified immunity protects Officer Ludemann from suit. Examining only the un-

disputed facts in the case, the court agrees and dismisses the false arrest claims against Ludemann on qualified immunity grounds.

■ Although "the right to be free from arrest or prosecution in the absence of probable cause is a long established constitutional right," a "police officer is entitled to qualified immunity shielding him or her from a claim for damages for false arrest where (1) it was objectively reasonable for the officer to believe there was probable cause to make the arrest, or (2) reasonably competent police officers could disagree as to whether there was probable cause to arrest." *Ricciuti v. New York City Transit Auth.,* 124 F.3d 123, 128 (2d Cir.1997) (citing *Golino v. City of New Haven,* 950 F.2d 864, 870 (2d Cir.1991)). Thus, the defense of qualified immunity-once called "good faith" immunity—now turns on the objective reasonableness of an officer's actions. *See generally Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

Discussing qualified immunity in the context of claims for false arrest, the Second Circuit has repeatedly stated:

In looking to the totality of the circumstances, courts must be aware that probable cause is a fluid concept-turning on the assessment of probabilities in particular factual context-not readily, or even usefully, reduced to a neat set of legal

---

any other rooms were entered." The defendants do not rely on this first allegation in their motion for summary judgment.

Def's Ex. F, another police report dated February 13, 2000, states: "Radisson management has the ability to identify card numbers used to access rooms. All the rooms, including 534[,] were accessed by a card which had been previously reported lost. The card was originally used/issued to employee Robert Miles. Due to multiple burglaries on the same date and the suspected link to one individual access card it is recommended case

be forwarded to the [detective bureau]." It is unclear from this report whether the "suspected link to one individual access card" refers to the evidence that the key that was used to enter all the burglarized rooms was Miles' masterkey or that of the plaintiff. Even if the latter, this report seems to rely on a previous report or previously discovered evidence that demonstrated the link, because it makes no other mention of this lock memory evidence and does not specifically describe the basis for any first-hand knowledge of this evidence.

rules .... [W]e have said that in the context of a qualified immunity defense to an allegation of false arrest, the defending officer need only show 'arguable' probable cause. This is because at its heart, the concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause ... and in those situations courts will not hold that they have violated the Constitution. Therefore, in situations where an officer may have reasonably but mistakenly concluded that probable cause existed, the officer is nonetheless entitled to qualified immunity. *See Lennon v. Miller,* 66 F.3d 416, 423 (2d Cir.1995) (" 'It is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials ... should not be held personally liable.' " ...)

*Caldarola v. Calabrese,* 298 F.3d 156, 162 (2d Cir.2002) (citations and internal quotations omitted). "[T]he defense [of qualified immunity] is available if the officer has 'arguable probable cause,' *Lee v. Sandberg,* 136 F.3d 94, 103 (2d Cir.1997), and he may not be required to pay money damages for making an arrest unless his 'judgment was so flawed that no reasonable officer would have made a similar choice.' *Lennon v. Miller,* 66 F.3d 416, 425 (2d Cir.1995)." *Provost v. City of Newburgh,* 262 F.3d 146, 166 (2d Cir.2001) (Newman, J., dissenting). Finally, as the Second Circuit in *Cerrone v. Brown,* 246 F.3d 194 (2d Cir.2001), put it:

Even on summary judgment, where all facts must be viewed in the light most favorable to the non-moving party, for the purpose of qualified immunity and arguable probable cause, police officers are entitled to draw reasonable inferences from the facts they possess at the time of a seizure based upon their own experiences. *See Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911[ ] (1996) (noting that "a police officer views the facts through the lens of his police experience and expertise. The background facts provide a context for the historical facts, and when seen together yield inferences that deserve deference"). A "police officer is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." Nor is a police officer required to "sit as prosecutor, judge, or jury" in making a probable cause determination.

*Id.* at 203 (citations omitted).

■ As discussed above, the uncontested facts in support of probable cause include the fact that the plaintiff was working during the hours when the rooms were burglarized; the fact that a stolen credit card was used on the day after the robberies at a Waldbaums located approximately 1.5 to 2.5 miles from the plaintiff's home, when the plaintiff was not at work; and the fact that the plaintiff owns a black jacket and that the suspect in the video was wearing a black jacket, both of which are facts that the plaintiff does not deny.

Although the court earlier in this ruling concluded that all the uncontested facts alleged by the defendants do not together support a finding of probable cause, it now also concludes that these uncontroverted facts provided Ludemann with "arguable probable cause" to arrest the plaintiff for qualified immunity purposes because "a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in the light of well-es-

tablished law." *Lee,* 136 F.3d at 102. Although Ludemann may not have "explore[d] and eliminate[d] every theoretically plausible claim of innocence before making an arrest," the law does not require him to do so to in order for the defense of qualified immunity to apply. *See Cerrone,* 246 F.3d at 203. Thus, the court finds that Officer Ludemann is entitled to qualified immunity with respect to the false arrest claims and grants summary judgment accordingly.

#### 4. *False Arrest Claim Against Officer John Doe*

The defendants also urge the Court to grant summary judgment in their favor with respect to the plaintiff's false arrest claims against Officer John Doe because "the complaint does not make allegations specific enough to permit the identity of the party to be ascertained after reasonable discovery." Defs.' Mem Supp. Mot Sum Jud at 15 (citing *Estate of Rosenberg v. Crandell,* 56 F.3d 35, 37 (8th Cir.1995)). The defendants point to the fact that the plaintiff has "never even deposed Officer Ludemann or any other member of the Enfield Police Department in an effort to determine the identity of John Doe." *Id.* The plaintiff offers no response in her memorandum in opposition.

█ The court agrees with the defendants. *Cf. Valentin v. Dinkins,* 121 F.3d 72, 75 (2d Cir.1997) (when "a party is ignorant of defendants' true identity, it is unnecessary to name them until their identity can be learned through discovery or through the aid of the trial court") (citing *Maclin v. Paulson,* 627 F.2d 83, 87 (7th Cir.1980)); *Davis v. Kelly,* 160 F.3d 917, 921 (2d Cir.1998) (observing that courts have rejected the dismissal of suits against unnamed defendants described by role until the plaintiff has had some opportunity for discovery to learn the identities of re-

sponsible officials and that "dismissal is premature where the opportunity to identify those involved has not yet been accorded"). The time for discovery is long past. Thus, the defendants' motion for summary judgment with respect to false arrest claim against Officer John Doe is also granted.

### B. STATE LAW CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (Count Three)

█ In Count Three, the plaintiff asserts a cause of action for intentional infliction of emotional distress under Connecticut state law. Neither party has argued that diversity jurisdiction offers an independent basis for federal jurisdiction. Having disposed of the Plaintiff's sole federal cause of action, the Court must dismiss the Plaintiff's state law claim for intentional infliction of emotional distress based on lack of federal question jurisdiction.

### CONCLUSION

For the foregoing reasons, the Defendant's Motion for Summary Judgment [Dkt. No. 14] is GRANTED with respect to the plaintiff's Fourth Amendment false arrest claim brought pursuant to Section 1983. Accordingly, the plaintiff's pendant state law claim is also dismissed due to lack of federal question jurisdiction.

**SO ORDERED.**